# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **KENALL MANUFACTURING CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 1284** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **H.E. WILLIAMS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.
## INTRODUCTION

Kenall alleges that HEW infringes two of its patents: Nos. 6,984,055 ("055 patent") and 7,494,241 ("241 patent"). The 241 patent is a continuation of the 055 patent, and the two patents share substantially identical specifications. With respect to the 055 patent, Kenall claims that HEW literally infringes independent claims 19 and 35, and dependent claims 23-28. It claims HEW infringes independent claim 1 and dependent claims 3-6 under the doctrine of equivalents. As for the 241 patent, Kenall asserts HEW literally infringes independent claims 1, 10, and 11, and dependent claims 2 and 6-9. It claims infringement of dependent claim 5 under the doctrine of equivalents.

The two patents-in-suit disclose lighting fixtures. Kenall's patents acknowledge that the prior art includes many different types of versatile light fixtures that come in "many engineering designs and configurations" for a variety of applications. (Col. 1:18-27). The patented light fixture, however, claims to improve the "versatility and adaptability of" prior art fixtures "in order to facilitate and enhance particular applications." (Col. 1:24-27). To overcome the limitation of prior

art fixtures, the patented fixture uses components that can be connected together in various configurations. (*See e.g.*, Col. 4:46-67). For example, the connectors – called bridges – have different shapes (*e.g.*, linear, "L"-shaped, "T"-shaped, or "+"-shaped) in order to allow the connection of multiple housings in different configurations. (*See* Figs. 2, 10-12; Col. 1:48-50; Col. 2:9-14; Col. 6:58-Col. 8:12).

**Subject Matter Of The Patents-In-Suit**

The patented light fixture has four basic components: (1) a housing, (2) endplates attached to each end of the housing, (3) an endcap for attachment to an endplate to close off the open end of a housing, and (4) a bridge for attachment to endplates to connect adjacent light fixtures together. Annotated patent Figs. 1 and 2 show a single- and multi-unit fixture with these modular components.







Figures 10, 11, and 12 show bridges having different shapes, such as an "L," a "T," or a "+,"
connecting multiple housing sections in different configurations:

The heart of this case is the how the bridges and endcaps attach to the endplates and how the
endplates attach to the housing. In all claims, these components must "seal" or "mate" together.
In some claims, the components achieve a fluid-impervious seal with or without gaskets; in other
claims, the components are "mated" together. Figure 4 provides a close up view of the end of a
housing, an endplate, and a bridge to be attached to that endplate.



Finally, within the housing of the fixtures are what are called "raceways," which are spaces through which media such as electrical wires pass.

The parties disagree over the construction of several terms in the claims at issue: "modular (lighting fixture)"; "isolated (raceway)"; "housing"; "endplate"; "sealing" and "mating"; "bridge"; and "adapted for attachment to any one of."  Claim terms generally are construed in accordance with the ordinary and customary meaning they would have to one of ordinary skill in the art in light of the specification and the prosecution history.  *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1329 (Fed.Cir. 2012); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005)(*en banc*). The specification and prosecution history provide evidence of how the PTO and the inventor understood the claimed invention. *Phillips,*  415 F.3d at 1317.

In reviewing these sources, if the specification or prosecution history defines a claim term, that definition shall apply even if it differs from the term's ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366–67 (Fed.Cir.2002).  Moreover, if a patentee makes a clear and unambiguous disavowal of claim scope during prosecution, that disclaimer informs the claim construction analysis by "narrow[ing] the ordinary meaning of the claim congruent with the scope

of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed.Cir.2003). Courts may rely on dictionary definitions when construing claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips,* 415 F.3d at 1322–23 (internal quotation marks omitted).

A patentee may act as his own lexicographer, but must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002); *Thorner v. Sony Computer Entertainment America LLC,* 669 F.3d 1362, 1365 (Fed.Cir. 2012). It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments; the patentee must "clearly express an intent" to redefine the term. *Helmsderfer v. Bobrick Washroom Equip., Inc.,* 527 F.3d 1379, 1381 (Fed.Cir.2008); *Thorner,* 699 F.3d at 1365.

Finally, claim terms must be construed in light of the entirety of the patent, including its specification, and the specification to be consulted is that of the issued patent, not an earlier application. *Sun Pharmaceutical Industries, Ltd. v. Eli Lilly and Co.,* 611 F.3d 1381, 1388 (Fed.Cir. 2010). Claim construction is not an exception to the rule that if words can be accorded their plain meaning, they must be so construed. *Atlantic Research Marketing Systems, Inc. v. Troy,* 659 F.3d 1345, 1354 (Fed.Cir. 2011). Similarly, hyper-technical readings of patents are to be avoided where they would arrive at an absurd result rather than achieve a common sense meaning. *Lisle Corp. v. A.J. Mfg. Co.,* 398 F.3d 1306, 1313 -1314 (Fed.Cir. 2005).

Before the claims are addressed and construed, it should be noted that Kenall agreed to file the first claim construction brief, followed by HEW's response, and Kenall's reply. (Dkt. 39, at 2). A couple of weeks later, Kenall asked the court to reverse the schedule in line with the Local Patent

Rules. Under those rules, the parties are required to exchange lists of claim terms in dispute and their proposed definitions of those terms. LPR 4.1(a). The idea is that the parties' claim construction briefs should squarely address the disputed issues rather than be "ships passing in the night." *See* LPR, Preamble. To that end, the parties met on a number of occasions and, in the end, agreed to dispute eight claim terms and exchanged proposed constructions of those terms. HEW filed its opening brief based on those disputed claim terms and proposed constructions. Kenall, however, ignored the procedure. When it responded to Kenall's brief, it altered five of the eight constructions it had previously espoused. That left HEW to address claim constructions that Kenall apparently had no intention of standing by, or, in any event, had decided not to pursue.

## II.
## CLAIM CONSTRUCTION

### A.

**"Modular" (Lighting Fixture)**

**Parties' Proposed Constructions**

| Kenall: | HEW: |
| --- | --- |
| a lighting fixture of one or more standardized elongated sections and components for facilitating setup and arrangement | a lighting fixture including standardized components to facilitate installation in one or more configurations |

The term "modular" in reference to "lighting fixture" is found in the preamble to several claims in the two patents-in-suit. As a general rule, preamble language is not treated as limiting. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed.Cir. 2012). The question becomes whether the preamble language is necessary to give meaning to the claims. 672 F.3d at 1347-48. A claim's preamble may limit the claim when the claim drafter uses the preamble to define the subject matter of the claim. *August Technology Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284

(Fed.Cir. 2011).

If the preamble "is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a [prior art] rejection)," it is not construed as a separate limitation." *Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d 1279, 1288-89 (Fed.Cir.2008). The preamble has no separate limiting effect if, for example, "the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention." *American Medical Systems, Inc. v. Biolitec, Inc*., 618 F.3d 1354, 1359 (Fed.Cir. 2010).

Still, it's not a simple matter to determine if a preamble is limiting. Even the Federal Circuit has struggled with the issue. *See, e.g., Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995) ( "Much ink has, of course, been consumed in debates regarding when and to what extent claim preambles limit the scope of the claims in which they appear."); *American Medical Systems, Inc. v. Biolitec, Inc*., 618 F.3d 1354, 1363-64 (Fed.Cir. 2010)(Dyk, J.,dissenting)(". . . our case law has become rife with inconsistency, both in result and in the articulation of the test."); 3 Donald S. Chisum, *Chisum on Patents* § 8.06[1][d] (2010)("the decisions are difficult to reconcile."). In this case, Kenall wants the preamble read as limiting, but HEW does not.[1]

Kenall argues that the preamble must be read as limiting because "the inventions are not applicable to street-pole lights, but rather to modular lighting fixtures." (*Kenall's opening Claim Construction Brief*, at 10). That's the sum total of Kenall's argument. It may have the visceral

---

[1] The suspicion is that Kenall wants to have the preamble read as limiting so that it can then argue that HEW's prior art citations do not disclose "modular" lighting fixtures.

appeal of being simple, but it's overly simple and unamplified.

As opaque as the applicable case law is, HEW at least relies on it to state its position. To HEW, one need only read the preamble along with the claims of the '055 patent to see that the term "modular" can be left out without changing the invention:

A modular lighting fixture, comprising:

first and second elongate housings each having ends;

first and second pairs of endplates respectively mated with the ends of the first and second elongate housings, the endplates each having a peripheral rim; and

a bridge adapted for joining one of the endplates of the first elongate housing with one of the endplates of the second elongate housing by sealing cooperation with the respective peripheral rims thereof.

(Patent 055; Col. 10, lns. 15-24). In this context – the only context that matters – modular is not limiting merely but merely descriptive of the limitations of the claims. *See American Medical Systems*, 618 F.3d at 1359. The claims describe a "structurally complete invention such that the deletion of that preamble phrase does not affect the structure . . . of the claimed invention." *American Medical Systems*, 618 F.3d at 1358-59. Generally, "modular" refers to something "constructed with standardized units or dimensions for flexibility and variety in use." http://www.merriam-webster.com/dictionary/modular. *See also* Webster's Encyclopedic Unabridged Dictionary, at 921 (1989)("composed of standardized units or sections for easy construction or flexible arrangement.").

The claims following the preamble clearly depict "modular" lighting fixtures, as that term is defined and commonly understood. Indeed, Kenall's own proposed definition of modular merely echoes the claims: "one or more elongate sections and components for facilitating setup and flexible

arrangement." In this instance, the general rule holds true, and the preamble is not limiting.

**B.**

**Isolated (Raceway)**

**Parties' Proposed Constructions**

| Kenall: | HEW: |
|---|---|
| a raceway located apart from another raceway with physical barriers therebetween at least at section-end components | an enclosed raceway |

The term "isolated" describing "raceway" appears in claim 5 of patent 055, which is dependent upon claim 4 and, in turn, claim 3:

> 3. The modular lighting fixture of claim 1 wherein:
>
> the first and second elongate housings *each* include a first raceway for routing distribution media; and
>
> the bridge includes a first wire pathway interconnecting the two first raceways.
>
> 4. The modular lighting fixture of claim 3 wherein the first and second elongate housings each include a second raceway and the bridge includes a second wire pathway interconnecting the two second raceways.
>
> 5. The modular lighting fixture of claim 4 wherein the first and second raceways are isolated from one another.

(Patent 055, Col. 10, lns. 27-37).

The parties agree that a "raceway" is a *distinct* space for passing media – like wiring – within a light fixture. Their dispute regards the extent to which raceways must be separated to be considered "isolated." Kenall contends that "[t]he patents disclose that along the lengths of the modular lighting fixtures . . . there are distinct spaces usable for routing wires and that those spaces

are isolated from one another by the physical barriers present in the modular components at the ends of the elongate sections, at the points of interconnection of joined elongate sections." (*Kenall's Opening Claim Construction Brief*, at 12). So, for Kenall, "isolated" means that the raceways need only be separated by a physical barrier at the endplates of the elongate housing, not along their entire length. This notion certainly seems to be contradicted by their concession that the "distinct space" runs the length of the modular lighting fixture. HEW argues, that a raceway must be completely "enclosed" along the entire length.– and not just at the aperture in the endplates.

HEW's interpretation is more convincing for the simple fact that two raceways separated from one another at one, small, discrete point at the end of the fixtures are not really isolated from one another. Under Kenall's construction, the entire raceway withing the lighting fixture would not be isolated at all.

Looking to the specification, as the parties do, one finds further support for HEW's construction. The specification refers at multiple points to isolated raceways, beginning with its discussion of figure 4:

> End plate 34 has a plate-like, skeletal body 142 having a plurality of through openings or passageways 134, 136, 138 and 140 formed therein. Such passageways 134, 136, 138, 140 provide wire routing structures that facilitate passage therethrough of electrical wires, illuminating sources, other electrical components, and related structures such as various cabling, adapters, etc. As described in more detail below, passageways 134, 136, 138, 140 **may each be parts of individual isolated raceways extending the entire length of module 24 by including enclosed passages within body portion 10.**

(Patent 055, Col. 6, lns. 3-14)(Emphasis supplied). The "raceway" is not merely the aperture or wire pathway in the bridge at the end of the housing. Indeed, it cannot be since the raceway is a passageway for media that extends "the *entire length*" of the housing. The apertures in the bridge are then but points in or parts of the individual isolated raceway. And, the "isolated raceway" may

include "*enclosed* passage[s] within" the body portion.

Later, the specification states that:

> Individual and joined bridges and/or housing sections **24** of a given lighting fixture establish therein, and along an entire expanse thereof, uninterrupted passageways. Such passageways may include "raceways" for accommodating wires, cables and the like. Such may be effectively isolated from ballasts and lamp wires. By providing physical barriers establishing and effectively separating a number of isolated raceways, for example, a passageway for the ballast power feed wires of a fluorescent lighting fixture does not interfere with the isolated raceways.

(Patent 055, Col. 8, lns. 13-22). To truly be isolated, they must be separated by some sort of physical barrier, not just at the ends of the housings in the endplate and bridge, but along their entire length.

Kenall's brief ignores every instance where raceways are described as extending the entire length of an elongate housing, focusing instead on the endplates having "through-frame openings" (Patent 055, Col. 5, 45-46) or a "plurality of through openings or passageways." (Patent 055, Col. 8, 28-31). But that puts out of view the fact that the raceways extend the length of the housings, not merely through the endplates. They are not "isolated" along the "entire length of the housing" if they are simply funneled through apertures on short passageways in the endplates and left completely open for the vast majority of their length.

Moreover, it is significant that the passageways of the endplates are said to provide "coupling elements **of extended raceways**." (Patent 055, Col. 8, 31-32)(Emphasis supplied). When a raceway is isolated, as in claim 5, the passageways in the endplates "may each be parts of individual isolated raceways extending the entire length of module 24 by including enclosed passages within body portion 10." (Patent 055, Col. 6, 11-14). The apertures in the endplates are never said to constitute a raceway or to provide, constitute or result in a raceway. In short, the

argument that an aperture is a raceway is a contradiction in terms and ignores the patent language and its basic design.

Kenall's last argument is that the drawings do not depict an enclosure running the length of the housing. It's difficult to say whether that's definitely the case, as only the very ends of the housings with endplates are shown in the drawings, perhaps because "drawings in a patent need not illustrate the full scope of the invention." *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*. 632 F.3d 1246, 1254 (Fed.Cir. 2011); *but see* 37 CFR 1.83(a)("The drawing . . . must show every feature of the invention specified in the claims.").

In sum, I reject Kenall's construction of the term "isolated raceway." Rather, the term "isolated raceway" should mean a distinct space for passing media – like wiring – within a light fixture that is separated along its entire length by some kind of physical barrier or means so that the wiring which runs through it is separated from the wiring that traverses another raceway. HEW's argument that the separation must be the result of some enclosed conduit-like structure is not borne out by anything in the patent. The raceway need not contain, for lack of a better word, a tube or conduit to enclose the wires.

**C.**

**"Housing"**

**Parties' Proposed Constructions**

Kenall:

a structure having an elongate base and sidewalls therealong to support and contain the lamp(s) and electrical components, and to which a lens may be attached

HEW:

a structure that supports or contains lighting fixture components

The real bone of contention here is whether a housing must "support *and* contain" lighting fixture components or may "support *or* contain" those components. The parties are also at odds over whether the "housing" must have sidewalls. The "housing" is referred to throughout the claims and is set forth in independent claim 1 as follows:

> first and second elongate housings each having ends;
>
> first and second pairs of endplates respectively mated with the ends of the first and second elongate housings, the endplates each having a peripheral rim; and
>
> a bridge adapted for joining one of the endplates of the first elongate housing with one of the endplates of the second elongate housing by sealing cooperation with the respective peripheral rims thereof.

(Patent 055, Col. 10, lns. 16-24; *see also* Claims 7,11, 14, 19, 35; Patent 244, Claims 1, 10, 11). Under the claims, the housing must be elongate and have ends. To have ends, it would naturally require a base. The "ends" are not described in the claims, but they must be able to "mate" with the "endplates."

Kenall argues that the housing must "support *and* contain" because it "should almost go without saying that a minimal requirement for 'housing' in a lighting fixture context is that it must contain the lamp(s) and electrical components." (*Kenall's Opening Claim Construction Brief*, at

16).  It relies on the definition of "housing" from Wikipedia – an odd choice perhaps of a definitional source – which states that it is an "enclosure containing some equipment or mechanism."  It is not clear how the word "containing" was meant to be used.  In any event, it is just as easy to find a dictionary definition that supports HEW's view that it may "support *or* contain."  *See, e.g.*, http://www.merriam-webster.com/dictionary/housing ("something that covers or protects: as a **:** a case or enclosure (as for a mechanical part or an instrument) b **:** a casing (as an enclosed bearing) in which a shaft revolves c **:** a support (as a frame) for mechanical parts"); http://www.thefreedictionary.com/housing ("Something that covers, protects, or supports, especially [a] frame, bracket, or box for holding or protecting a mechanical part: a wheel housing.").

Moreover, Kenall fails to explain or even address how the sidewalls are supposed to "support" the lamps that run the length of the housing (and are affixed or attached to its top).  They might contain (*i.e.* surround) those lamps, but they would not *support* and contain them, as Kenall's construction would appear to have the sidewalls do.  HEW bases its position on these definitions and its notion that "the only embodiment of the housing disclosed in the patents-in-suit does not 'contain' the lighting fixture because the housing is open along its entire bottom side." (*HEW's Opening Claim Construction Brief*, at 12). *See Funai Elec. Co., Ltd. v. Daewoo Electronics Corp.*, 616 F.3d 1357, 1371 (Fed.Cir. 2010)*(*a claim construction that excludes a preferred embodiment is rarely, if ever, correct).

It's not entirely clear where HEW is going with this.  If it means that anything that is not completely enclosed cannot be said to contain something, its position is not convincing.  In common parlance, an open (or topless) box "contains" whatever is inside it.  Similarly, in common parlance, a bowl contains cereal, and a vase flowers.  On the other hand, perhaps HEW means that a housing

without a bottom lens cannot "contain" the light fixture components but would only "support" the components. "Contain" would come in only in the sense that the lighting fixture components are within the area defined by the housing.

The only claim that mentions sides to the elongated "housing" in which the lighting fixture components are found is claim 29: "[t]he modular lighting fixture of claim 27 wherein: . . . the housing has downwardly opening grooves along elongate sides thereof adapted for receiving respective ones of the flanges of the lens . . . ." (Patent 055, Col. 12, lns 10-12). But that claim is dependent on claim 27, which is in turn dependent on claim 25, which is dependent on claim 19 – an independent claim. Claim 29 is a twig on a branch of a limb of a tree. Its limitation of elongate sides does not add them to independent claim 19. *Phillips*, 415 F.3d at 1314-15 (Fed.Cir. 2005)(". . . the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Kenall submits that it doesn't matter that sides are not claimed anywhere in the claims at issue. For Kenall, every elongate housing *must* have sides just as every table must have a top. The argument is a patent *non sequitur*. By definition, all tables have tops. Similarly, all elephants have trunks. There is no comparable rigidity and certainty of definition regarding light fixtures. Some may have sides; others will not. A common definition of housing is something that supports an apparatus, like a frame or even a bracket. Every bracket certainly doesn't have sides and there's no reason why a three-sided housing (base and two ends) can't support lighting fixture components. It plainly can. In short, Kenall's *a priori* definition of light fixtures and elongate housings is mistaken and unacceptable.

Kenall points to a portion of the specification which describes the preferred embodiment of the housing depicted in figure 1 as including:

> opposed lineally-extending side walls 56, 58 extending co-extensively with base 48 at elongate upper edges 64 and 66 thereof.

> Housing sidewalls 56, 58 of elongate modular lineal section 24 are formed of an extruded high-strength metal alloy, such as aluminum alloys, as a body portion 10 of each modular sections 24. Sidewalls 56, 58 are formed at opposite elongate edge portions thereof with channel-like, downwardly-opening grooves 96, 98 that matingly receive therewithin the elongate free edge portions of lens 80.

(Patent 055, Col. 4, ln. 64-Col. 5, ln. 7). Of course, this is merely a preferred embodiment, and it is generally improper to read limitations from it into the claims where there is "no clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed.Cir. 2012); *American Piledriving Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1332 (Fed.Cir. 2011). Kenall doesn't point to any such clear indication here.

In fact, Kenall submits that a lens is "not always required to be part of the inventive structures"– a housing may, or may not, have a lens attached. (*Kenall's Opening Claim Construction Brief*, at 18-19). "[T]he lens . . . is plainly not part of the housing." (*Kenall's Opening Claim Construction Brief*, at 19). The only claim that mentions sides at all mentions them as designed to receive a lens which, as Kenall states, is not necessary to the housing. Moreover, under claim 27, the lens could be attached to the ends of the housing. (Patent 055, Col. 11, ln. 53-Col. 12, ln. 3)( "The modular lighting fixture of claim 25 wherein the lens has end edge portions, and wherein each of the end-plates has an arcuate groove adapted for slide ably receiving one of the end edge portions of the lens to thereby seat the lens in sealing engagement within the groove."). Again, even with a lens, a housing need not necessarily have sides.

A "housing," therefore, is a structure that supports or contains lighting fixture components.

## D.

**"Endplate"**

**Parties' Proposed Constructions**

| Kenall: | HEW: |
|---|---|
| a unitary structure for attachment to a lengthwise end of a light fixture housing | a structure for attachment to a lengthwise end of a light fixture housing |

In regard to "endplates", the debate is whether they must be "unitary" in structure. Kenall's position is that:

> . . . Kenall recognizes that the term by its very nature refers to a *unitary* structure. Given that an "endplate" is a unitary structure, and given that it should be understood as such . . . it is appropriate to adopt Kenall's proposed meaning. In this case, the meaning of endplate is clearly inherent in the word itself, and dictionary definitions of the word "plate" consistently refer to single-piece structures.

(*Kenall's Opening Claim Construction Brief*, at 19-20). Kenall doesn't cite to any of these dictionary definitions. Instead, it claims in a footnote that its attorneys reviewed a lot of definitions and didn't see one that involved a multi-piece construction. (*Kenall's Opening Claim Construction Brief*, at 20 n.10). But unsupported statements in briefs are not evidence and don't count. *Dexia Credit Local v. Rogan,* 629 F.3d 612 (7th Cir.2010).

Kenall appears to be correct. *See, e.g.,* http://www.thefreedictionary.com/plate (**1.** A smooth, flat, relatively thin, rigid body of uniform thickness; 2. **a.** A sheet of hammered, rolled, or cast metal); http://www.merriam-webster.com/dictionary/plate (a **:** a smooth flat thin piece of material; b (1) forged, rolled, or cast metal in sheets usually thicker than $^1/_4$ inch (6 millimeters)). But, of

course, a dictionary definition does not always rule the day in claim construction:

> . . . courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." However, "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." Indeed, "the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language. The resulting definitions therefore do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it."

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1347 (Fed.Cir. 2009). At the same time, "[a] dictionary definition has the value of being an unbiased source accessible to the public in advance of litigation." *Phillips*, 415 F.3d at 1322. The upshot is that a party cannot avoid what can be ascertained by reference to the patent documents merely because a dictionary definition can be found supporting the party's construction.

HEW submits that Kenall is attempting to limit its claims according to its preferred embodiment, which, of course, it may not do. *Dealertrack*, 674 F.3d at 1327; *American Piledriving*, 637 F.3d at 1332; *Phillips,* 415 F.3d at 1323. Kenall offers no specific response to that contention.

HEW also argues that nothing in the patents, claims, or specifications says that the endplate must be made of a single piece of material. HEW points out that Kenall knew how to claim unitary end pieces when it wanted to restrict the scope of its claims as is apparent from the prosecution histories. For example, in the parent '423 application, Kenall claimed such "integrally formed" or "cast" end pieces in a "unitary one-piece configuration." (*Joint Appendix*, at JA-74). Kenall dropped these limitations when it abandoned the '423 application and did not repeat them or the "unitary" or "integrally formed" limitations in the '055 or '241 patents. Additionally, the specification of the

18

'423 application described the use of "integrally formed" end caps as a "preferred embodiment." (*Joint Appendix*, at JA-59). HEW thinks that Kenall deleted this portion of the specification to make clear that the end caps did not have to be a unitary structure when it applied for the '055 and '241 patents.

Kenall contends that HEW can't make an estoppel argument because the changes it made were not done in response to prior art. (*Kenall's Opening Claim Construction Brief*, at 20). It cites no case law in support of this contention which, in most cases and jurisdictions – certainly this jurisdiction – means its argument is waived. *Hess v. Kanoski & Associates*, 668 F.3d 446, 455 (7th Cir. 2012); *United States v. Hook,* 471 F.3d 766, 775 (7th Cir.2006). Moreover, while it is true that prosecution history estoppel "arises when an amendment is made to secure the patent and the amendment narrows the patent's scope," *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 736 (2009); *Felix v. American Honda Motor Co., Inc*., 562 F.3d 1167, 1182 (Fed.Cir. 2009), HEW is not making an estoppel argument, but rather a common-sense retort to Kenall's "it goes without saying" position.

If it is self-evident that an endplate is an intrinsically unitary structure, why did Kenall feel the need to employ terms such as "unitary" and "integrally formed" in its parent patent application? *See Hologic, Inc. v. SenoRx, Inc*., 639 F.3d 1329, 1339 (Fed.Cir. 2011)(Friedman, J., *dubitante*)("The use of the term . . . in these two claims shows that when the patentee wanted the claim to include that limitation, he knew how to do so, *i.e.,* by explicitly including those words. To me, these facts indicate that, had he intended claim 1 also to include that limitation, he would have explicitly included that language in that claim, as he did in claim 2 and 6, but not in claim 1 or the other two independent claims.").

Kenall has no real response to all this other than to say that, in the end, it removed the term "unitary" because it decided it was redundant to the inherent characteristic of an "endplate." (*Kenall's Opening Claim Construction Brief*, at 20). But unsupported statements in briefs do not count and will not be considered. *United States v. Thompson*, 2007 WL 1725298, 2 (N.D.Ill. 2007); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. Adminastar Federal, Inc.*, 324 F.3d 492, 494, 497 (7th Cir. 2003). So, apparently, the revelation that endplates are, *by their very nature*, unitary structures – Kenall's vehement stance – came very late in the game to Kenall. It's an odd thing to have missed, however, for so long, something that is purportedly so obvious that it can be no other way.

In addition to the phrasing from the parent patent application, there is one point in the claims where the inventor felt the need to indicate that endplates were "integrally formed":

> 27. The modular lighting fixture of claim 25 wherein the lens has end edge portions, and wherein each of the end-plates has an arcuate groove adapted for slide ably receiving one of the end edge portions of the lens to thereby seat the lens in sealing engagement within the groove.
>
> 28. The modular lighting fixture of claim 27 wherein the groove is defined by a groove-forming portion *integrally formed* in each of the endplates.

(Patent 055, Col.11, ln. 53-Col. 12, ln. 6)(emphasis supplied). Again, if it truly were self-evident that every endplate is, by its nature, "unitary", it would be just as self-evident that a groove in an endplate would be "integrally formed" in the endplates as well.

Hence, I reject Kennel's proposed construction and adopt HEW's.

**E.**

**"Sealing"**

**Parties' Proposed Constructions – "Sealing"**

Kenall:

Sealing as used with respect to the juncture of members to one another not requiring a gasket – having a facing surface the face of which is shaped to provide for complimentary engagement

sealing as used with respect to the juncture of members having a gasket – fluid-impervious joining of members

HEW:

joining two structures in a manner that prevents the passage of fluids between the two structures

**Parties' Proposed Constructions – "Mating"**

Kenall:

having a facing surface the face of which is shaped to provide for complimentary engagement

HEW:

fitting two parts together via corresponding shapes

The dispute over the construction of these terms is the most labyrinthine of all. And, with all respect, the parties' presentations are very difficult to follow. The parties cross swords over whether "sealing" must always refer to a fluid-impervious connection or whether it may be used to refer to both a fluid-impervious seal (with a gasket) and an ordinary seal (with complimentary facing surfaces); and whether "sealing" and "mating" may be used interchangeably to mean the same thing. "Sealing" appears in eight claims of Patent 055: 1, 7, 11, 14, 18, 19, 26, 34. Claims 1, 19, 24, 26, and 34 are asserted against HEW. Claim 1 calls for a bridge that joins two endplates of elongate housing "by sealing cooperation with the respective peripheral rims thereof." Claim 19 requires "a pair of endplates adapted for sealing attachment to either end of the housing." "Sealing" is used in Claim 24 to describe an adaptation for engagement between an endplate and an endcap: "adapted

for sealing engagement." Claim 26 involves a gasket "for providing sealing between the housing and the lens," and claim 34 calls for a gasket "for sealing joinder" of the endplate and the lens. "Sealing" also appears in claim 7 of Patent 241, asserted against HEW, and there it requires that the light fixture "further comprises a plurality of screws or bolts further sealing the additional structure to the endplate by fastening." When "seal" is used in connection with the lens in the claims, the seal is accomplished by a gasket. (Patent 055, Claims 26, 34). When "seal" is used in regard to other portions of the invention – endplates and bridges – there is no mention of a gasket. (Patent 055, Claims 1, 7, 11, 14, 18, 19, 24; Patent 241, Claim 7). Whether the "seal" must be fluid tight is never referred to in the claims.

"Mating" appears in Claim 1, which calls for "first and second pairs of end plates respectively mated with the ends of the first and second elongate housings." So, in claim 1, there is "sealing" between bridge and endplates, while there is "mating" between endplates and housing. "Mating" also appears in Claim 35, which entails "a pair of endplates with respective perimeter surfaces adapted for mating attachment to either end of the first housing . . . ." In Patent 241, it is used in Claims 10 and 11:

> an additional structure having a second peripheral surface extending in a lengthwise direction with substantially the same contour as the peripheral surface on the second side of the end plate, the additional structure being connected to the endplate with the second peripheral surface being proximate to and in **overlying mating engagement** with the first peripheral surface of the second side of the end plate.
>
>         \*        \*        \*
>
> au additional structure having a second peripheral surface with a substantially similar contour as the first peripheral surface on the second side of the endplate, the additional structure being connected to the endplate with the second peripheral surface of the additional structure being proximate to and in **overlying mating engagement** with the first peripheral surface on the second side of the endplate. (Emphasis supplied).

"Mating", then, is also used in connection with attachments made to the endplates.

Kenall contends that the patent uses "sealing" and "mating" interchangeably to mean the same type of connection. It explains that it chose various words to describe the same thing because "the English language is rich and there are a number of words which, in the context of the 055 and 241 patent disclosures, are appropriate descriptions." (*Kenall's Opening Claim Construction Brief*, at 22). Apparently, under Kenall's view, the drafter of the patent must have had a notion to add a little pop and sizzle to the rather tedious subject of lighting fixture patents. But if true – and we doubt it – it is poor drafting practice. *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed.Cir. 2004). It would import nothing but uncertainty into the already uncertain job of claim construction.

The English language is rich not because it has a plethora of words that are interchangeable, but because its has words that, while similar in meaning, connote or even denote varying degrees and nuances of meaning. It would really be a terrific language to use in the drafting of patents, but few ever seem to give it a chance. Instead, those who draft patents inexplicably employ a tortured jargon, filled with words like "sealingly" or "matingly" that appear nowhere but in patents and then are used in a context that often is obscuring rather than illuminating.

Acceptance of Kenall's argument would sound the death knell for the general presumption in patent law that different terms have different meanings. *Chicago Bd. Options Exchange, Inc. v. International Securities Exchange, LLC*, 667 F.3d 1361, – (Fed.Cir. 2012). "In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings." *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed.Cir.2000). Kenall's formulation does just the opposite, and makes claim

construction more speculative and iffy than it already is.

In any event, in the English language, "sealing" and "mating" do not mean the same thing. The dictionary definition of "seal," as HEW points out, denotes imperviousness to some type of invasive element: " c (1)**:** a tight and perfect closure (as against the passage of gas or water) (2) **:** a device to prevent the passage or return of gas or air into a pipe or container." http://www.merriam-webster.com/dictionary/seal. "Mate", on the other hand, in the context of assembly, does not; it is a lesser degree of attachment, merely a joining or a fitting together. *See* http://www.merriam-webster.com/dictionary/mate?show=3&t=1339512027 (t.v. "to join or fit together"; *i.e.* "to become mated <gears that *mate* well>").[2]

The terms at issue even appear in the same claim. As noted above, Claim 1 of Patent 055 uses both terms, thereby suggesting that two separate thoughts or concepts are intended. "Mating" is used in regard to attachment of endplates to the ends of housings, and "sealing" is used in regard to the attachment of bridges to those endplates. "When an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc*., 381 F.3d 1111, 1119-20 (Fed.Cir. 2004).

The terms are also used in two separate claims – 19 and 35 – to refer to the attachment of endplates to ends of housings. There is a "sealing attachment" in Claim 19, and a "mating attachment" in Claim 35. When different words or phrases are used in separate claims, a difference

---

[2] And what of the mere "attachment" in Claim 19 – between endplates and bridge – that is not described at all? It is neither a sealing or a mating attachment; what kind of connection is it? Or is it, too, no different that a "mating" attachment and a "sealing" attachment without a gasket?

in meaning is presumed unless the written description and prosecution history indicate that a proper reading of the terms shows they cover the same subject matter. *Nystrom v. TREX Co., Inc*., 424 F.3d 1136, 1143 (Fed.Cir. 2005).

Kenall says the evidence that the terms are used interchangeably derives from the "essence of this novel and highly-beneficial modular lighting fixture system . . . . The inherent nature of the endplates and other joining and end structures of the modular system together with the fact that their facing surfaces are particularly 'adapted' (formed) to match each other hand-in-glove. *I.e.*, complimentary inter-engage one another, go to the heart of the inventions. " (*Kenall's Opening Claim Construction Brief*, at 22). With all deference, this statement is unedifying, and Kenall fails to point to any passage in the specification that indicates "sealing" and "mating" are synonyms

> Kenall goes on to note that:
> the patents relate to modular lighting fixtures which are "effectively tolerant of and resistant to physical abuse as well as to environmental hazards" (col. 8:51-52), and one of the most typical environmental hazards involves water – thus showing that use of the word "sealing" is not out of place.

(*Kenall's Opening Claim Construction Brief*, at 23). From this, Kenall derives a definition of "sealing" – and "mating," since Kenall thinks they are synonymous – as effecting a "complimentary engagement" as a result of the shapes of the surfaces of the items to be joined.

It's not entirely clear how this passage helps Kenall's cause. If the fixture is to be resistant to an environmental hazard like water, it would seem the specification demonstrates that "sealing" involves a water-tight, or at least a water-resistant, connection. As already noted, the dictionary requires a connection that is "perfect" and precludes the passage of an element like water. As such, the dictionary definition certainly does not contradict the specification – or the claims. *See Ultimax*

*Cement*, 587 F.3d at 1347.  At most, there is some wiggle room between water-tight and water-resistant.  Along these lines, Kenall explains that the "complimentary inter-engagement – the 'seal' – results in a 'tortuous path' that "restrict[s] fluid ingress."  (*Kenall's Opening Claim Construction Brief*, at 24).[3]  It would seem, then, that Kenall finds a subtle distinction between the fluid-impervious seals with gaskets, and the other seals or mates that merely restrict fluid with a tortuous path.  The specification throws a monkey wrench into that when it says that "a structure according to the invention also provides fluid-impervious sealing."  (Patent 055, Col. 3, lns. 47-49).  Found in the "Summary of the Invention", that's not a description of a "preferred embodiment, but  more broadly describe[s] the overall invention[]. . . ."  *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1348 (Fed.Cir. 2004).

Without help from the patent, itself, Kenall cites a couple of district court cases where the courts did not impose a "fluid-impervious" construction on the term "seal."  But, in both cases, the patent and specification readily supported that construction.  In *Protective Optics, Inc. v. Panoptx, Inc.*, 458 F.Supp.2d 1053, 1063 (N.D.Cal.2006), the court found that the "seal" did not have to be a perfect, water-tight closure.  But, unlike here, the patent gave no indication that the seal needed to be water-tight.  458 F.Supp. 2d at 1063.  In addition, the specification indicated that the seal need not be "absolute," but merely a "snug fit."  *Id.*  Similarly, in *St. Jude Medical, Inc. v. Access*

---

[3] To further confuse matters, Kenall refers to the industry standards for such lighting fixtures.  This is considered extrinsic evidence and cannot be resorted to if it contradicts the intrinsic evidence.  *Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Services, Inc.*, 674 F.3d 1365, 1374 (Fed.Cir. 2012).  The European standard requires protection against water that is splashed in the fixture and a perfect enclosure against dust.  Underwriters Laboratories provides the American  requires protection against condensation and humidity – a far greater level of "seal" than one that wards off splashed water.  Kenall claims the "seal" of the patent meets both standards.  (*Kenall's Opening Claim Construction Brief*, at 24).  As such, it must be humidity resistant which would seem to require a water-tight seal – thereby undermining Kenall's construction – and not just water-resistant, which would be suitable for the splashed water contemplated in the European standard.

*Closure, Inc.*, 2010 WL 2868507, 37 (W.D.Ark. 2010), the specification referred to the quality of the seal as "good," meaning less than perfect. It also indicated that the use of the device alone – a wound plug – without pressure would not result in a seal.

It should also be noted that Kenall may not be entirely accurate when it claims that fluid-impervious seals are limited to seals employing gaskets. The specification shows that a gasket is just one way of achieving a fluid-tight seal:

> A lighting fixture may further include a gasket disposed between the body of the fixture and its lens for establishing a fluid-impervious seal between the body of the fixture and the lens. *Various structures* may be used to establish a fluid-impervious seal between the body of the fixture and the lens.

(Col. 8:62-67 (emphasis added)). As HEW reads the specification, a gasket is just one of "various structures" that may be used to achieve a fluid-tight seal. At one point, the specification indicates that a fluid-tight seal may be achieved when a flange is fitted into a groove. (Patent 055, Col. 2, lns. 65-67). That undermines Kenall's stance that the "patents use the term 'sealing' in two clearly different specific contexts, namely, to refer to the junctures of an endplate with other non-lens structures and also to refer to the fluid-impervious junctures brought about by gasketing of lenses." (*Kenall's Opening Claim Construction Brief*, at 25). It is true, however, that elsewhere, the specification does focus on gaskets. It describes use of a gasket "for sealing" the sides of the lens to the housing (Col. 5:7-9), "to sealingly engage" the ends of the lens 80 (Col. 5:38-39; Col. 6:30-33), "for sealing the housing against invasion by objectionable ambient and foreign substances" (Col. 8:59-62), and "for establishing a fluid-impervious seal" between the housing and the lens.

(Col. 2:42-45; Col. 8:62-65).[4]

So, as already noted, in the claims, gaskets are always used in conjunction with the lens, with perhaps a single exception noted in fn. 4 below. The seal obtained when the gasket is used is described as fluid-tight when it is described at all. There is no instance in the patent where the seal achieved with a gasket is described as anything but fluid-tight. But there are instances where it is left unmodified. But, the specification indicates that various structures can be used to get the fluid-tight seal – flange and groove for example.

In sum, I reject Kenall's proposed assertion and adopt HEW's.

## F.

**"Bridge"**

**Parties' Proposed Constructions**

Kenall:                                            HEW:

a structure adapted for coupling multiple        a distinct structure that connects two parts
housings for extension

HEW contends that a bridge must be a distinct structure that connects two parts – it cannot be, for example, two endplates joined back-to-back. It also does not connect housings, but endplates of housings. (*HEW's Opening Claim Construction Brief*, at 22). Kenall submits that this is too

---

[4] There is another portion of the specification that refers to a gasket used to seal the housing from environmental hazards that appears to be a separate gasket from the one used in conjunction with the lens:

The lighting fixture may further include a gasket seated and secured in the housing along an expanse thereof and in sealing engagement for sealing the housing against invasion by objectionable ambient and foreign substances. A lighting fixture may further include a gasket disposed between the body of the fixture and its lens for establishing a fluid-impervious seal between the body of the fixture and the lens.

(Patent 055, Col. 8:59-65).

generic; a bridge does not just connect any "parts" but it is part and parcel to the modular nature of the invention that it connect housings. But it does not really address the "distinct" portion of HEW's position.

Returning to the claims, Claim 1 provides:

A modular lighting fixture comprising:
first and second elongate housings each having ends;

first and second pairs of endplates respectively mated with the ends of the first and second elongate housings, the endplates each having a peripheral rim; and

a bridge adapted for joining one of the endplates of the first elongate housing with one of the endplates of the second elongate housing by sealing cooperation with the respective peripheral rims thereof.

(Patent 055, Claim 1 (emphasis supplied)). In this claim, the bridge does not join the housings except by way of the endplates, which are not part of the housings, but are connected to them. Clearly, here, the bridge is a distinct structure, separate for endplates and housings. The case is similar in the other independent claim at issue, Claim 35:

A method of modular lighting fixturing comprising:
providing an elongate first housing having ends; and providing a pair of endplates with respective perimeter surfaces adapted for mating attachment to either end of the first housing, **each of the endplates being attachable to any of an angularly-disposing bridge, a ring, and an end cap, wherein the bridge defines a structure adapted for angularly-directable extension of the first housing,** and wherein the ring defines a structure adapted for linear extension of the first housing.

(Patent 055, Claim 35). Again, the bridge is a distinct structure. There is no claim for joinder of housings by endplates.

The specification underscores this construction. (*See also* Patent 055, Col. 1, ln. 64-Col. 2, ln. 2; Col. 2, lns. 12-14; Col. 3, lns. 3-10; Col. 4, lns. 3-7 (describing Fig. 4); Col. 4, lns. 12-14 (describing Fig. 5); Col. 5, lns. 56-59). In addition, endplates are not bridges, but "bridge-like",

indicating that a bridge is something distinct from an endplate or end of a housing.  (Col. 5, lns. 43-46).  "Bridge" denotes a connection between two things, here, housings; "endplate" does not.

Moreover, HEW argues that prosecution disclaimer precludes interpretation of endplate as bridge.  In the application for Patent 055, Kenall posited a claim – Claim 48 – for "sealingly joining together one of the mounted endplates for each of the first and second housing sections . . . .", *i.e.* a connection by endplate without a distinct bridge.  (JA-0398).  In a telephone interview with Kenall's patent counsel, the Patent Office stated that all claims of the pending application which did not require a bridge, including claim 48, would be rejected in light of the prior art.  In response, Kenall's patent counsel "authorized an Examiner's amendment requiring cancellation of claims 35-41 and 43-49 from the application, for later submission in a continuation or CIP application."  (JA-499).  This amounted to a cancellation of all claims not requiring a bridge.  HEW submits that this is "prosecution history disclaimer" and works as a bar to construction of the"bridge" element as non-distinct structure.

Kenall contends that:

> This argument fails because Kenall's cancellation of claim 48 in no way involved a surrender of claim scope in this regard.  If [sic] fact, the Examiner's Interview Summary Record (JA-499) states, in pertinent part, that claims 43-49 in the application were cancelled "for later submission in a continuation or CIP application."  This situation, particularly considering that among the claims pursued in the continuation application (which led to the '241 patent) were some claims not reciting a bridge, does not amount to any prosecution-history estoppel such as that argued by HEW. There is no recapture of scope involved in the proper meaning for "bridge" proposed by Kenall.

(*Kenall's Opening Claim Construction Brief*, at 37).  Kenall cites no pertinent authority to support its position and, as such, its argument is waived.  *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 848 F.2d 1415, 1418 (7th Cir. 1988)("Centrale has waived its waiver argument by raising it

in a perfunctory manner and by citing no authority."); *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003)(Posner, J.); *Hess*, 668 F.3d at 455; *Hook*, 471 F.3d at 775.

Unlike Kenall, HEW briefs the issues with applicable case law. In *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1176 -1177 (Fed.Cir. 2008), the Federal Circuit explained that there was a very subtle distinction between the doctrines of prosecution history disclaimer and prosecution history estoppel, but they were closely related, and both required a clear and unmistakable disavowal:

> we described the relationship between prosecution disclaimer (limiting claim scope because of statements made by the patentee in prosecution) and argument-based prosecution history estoppel (limiting the scope of the doctrine of equivalents because of statements made by the patentee in prosecution) [in *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed.Cir.2003)]. We explained that "for prosecution disclaimer to attach our precedent requires that alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Id.* at 1325-26. We noted that the same standard applies to the doctrine of argument-based estoppel. *Id.* at 1326 n. 1; *see Cordis I,* 339 F.3d at 1363.

*Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1176 -1177 (Fed.Cir. 2008). Kenall does not explain how cancellation of the bridge-less connection claims from Patent 055 in the face of prior art was not a clear and unmistakable disavowal. If the employment of a distinct bridge is one of the things that made the invention unique – and patentable – in the Summer of 2005, what intervening event would allow for the patentability of a connection without a distinct bridge at a later date?

Because the bridge must be a distinct structure does not mean that it merely "connects parts." In the above-cited mentions of "bridge," it always provides the connection between endplates of a housing. HEW does not offer much in the way of support for this portion of its position – no citations to the specification or prosecution history.

Consequently, a bridge is a distinct structure adapted for coupling multiple housings by those

housings' endplates.

<h1 style="text-align:center">G.</h1>

**"Adapted for Attachment to Any One of"/ "Attachable to Any One of"**

**Parties' Proposed Constructions**

Kenall:                                          HEW:

requires attachment to any one of the structures        designed for attachment to all of the following
of the group of structures thereafter listed

The phrases at issue here appear in Claims 19 and 35 of Patent 055:

. . . each of the endplates having respective perimeter surfaces adapted for attachment
to any one of a bridge adapted for angularly-directable extension of the housing, a
bridge adapted for linear extension of the housing, and an endcap.

*        *        *

each of the endplates being attachable to any of an angularly-disposing bridge, a
ring, and an endcap, . . .

(Patent 055, Claim 19; Claim 35). Despite the differences in phraseology ("requires attachment"
versus "design for attachment") the parties do not really dispute that the endplate must be designed
or intended for attachment to certain structures. The real dispute is whether the phrases "any one
of" in Claim 19 and "any of" in claim 35 of Patent 055 mean that the endplate must be designed to
be attached to *all of* the three structures listed following the phrase, or need only be designed to be
attached to *one of* those three structures.

The answer seems obvious. If an object is "attachable to any of" three other objects, listed
conjunctively (*i.e.*, A, B and C), it must be attachable to each of those objects, albeit only one of
them at a time. The same goes for an object "adapted for attachment to any one of" of three other
objects. If the patentee had wanted to say that the object was attachable to just one of the other

objects listed, he ought to have listed those three objects disjunctively (*i.e.*, A, B and C). The endplate in question, then, must be attachable to all three listed options. This seems simple enough; but patent law and claim construction often do not enforce simplicity.

Kenall contends, once again without any references to applicable case law, that the claims are written in Markush form. Kenall explains that this means that alternatives listed in an A, B, *and* C format, and the language of the claim shows that the intent is to list alternatives. A claim in *Markush* form, Kenall continues, is satisfied where only one of the listed elements is used. (*Kenall's Opening Claim Construction Brief*, at 33). In other words, an endplate would be infringing if it were attachable to any one of the three listed objects, as opposed to being required to be attachable to all three.

A Markush group is a form of drafting a claim term meant to limit the claim to a list of specified alternatives. *Abbott Laboratories v. Andrx Pharmaceuticals, Inc*., 473 F.3d 1196, 1210 (Fed.Cir. 2007). The Federal Circuit tells us that:

> Claim drafters often use the term "group of" to signal a Markush group. A Markush group lists specified alternatives in a patent claim, typically in the form: a member selected from the group consisting of A, B, and C. *See Manual of Patent Examining Procedure* § 803.2 (2004). A Markush group by its nature is closed. If an applicant tries to claim a Markush group without the word "consisting," the PTO will insist upon the addition of this word to ensure a closed meaning. Thus, in order to "close" a Markush group, the PTO insists on the transition phrase "group consisting of."

*Gillette Co. v. Energizer Holdings, Inc*., 405 F.3d 1367, 1372 (Fed.Cir. 2005). So, in order to argue that it has used a Markush format, Kenall has to have used the phrase, "group consisting of." *Gillette*, 405 F.3d at 1372; *Abbott Laboratories v. Baxter Pharmaceutical Products, Inc*., 334 F.3d 1274, 1280-81 (Fed.Cir. 2003)("'[a] Markush group, incorporated in a claim, should be 'closed,' i.e. it must be characterized with the transition phrase "consisting of,". . . '." (quoting Stephen A.

Becker, *Patent Applications Handbook* § 2:17 (9th ed.2000).

Obviously, Kenall did not use the "consisting of" phrase in its drafting of the patent and its argument therefore fails under clear Federal Circuit precedent. A patent holder simply cannot declare years after the patent that it employed a Markush group.

Accordingly, the endplate must be designed so that it is attachable to all of the items on the list, albeit one item at a time.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 2/1/13